No. 31,500

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general, *Plaintiff,* v. H. M. PERKINS (otherwise known as HERMAN MC-COY PERKINS), *Defendant.*

(28 P. 2d 765.)

Opinion filed January 27, 1934.

*Roland Boynton,* attorney-general, *Everett E. Steerman,* assistant attorney-general, for the plaintiff; *T. F. Railsback* and *Fred Robertson,* both of Kansas City, of counsel.

*H. M. Perkins,* of Kansas City, *pro se.*

The opinion of the court was delivered by

HARVEY, J.: This is an action in quo warranto inquiring into the authority of defendant to practice law in this state and asking for appropriate orders in relation thereto. The petition alleges briefly that defendant is and has been for more than twenty years a resident of Kansas City, Wyandotte county, in this state; that he has never been admitted to practice law in any of the courts of the state, and is lacking in the educational and professional qualifications of an attorney at law; that he claims to hold and does exercise the right to practice law in such courts, and persistently over a period of many years has filed numerous groundless actions in the courts of the state charging sundry persons, public officials, including courts and judges, with varied misconduct and derelictions, to the detriment of the public and the due administration of justice.

Defendant's answer questions the jurisdiction of this court to inquire into this matter and to make orders concerning it. He denies generally the allegations of the petition and alleges that in December, 1900, he took the examination for the admission of attorneys in St. Louis, Mo., and was admitted to practice law as an attorney in all the courts of that state; that in January, 1907, he took the oath of an attorney in the district court of Wyandotte county, Kansas, for the trial of a case then pending in that court, and since then has tried many cases in that court; that he made application to this court to be permitted to practice law in this state, but because of a controversy with one of the judges of the district court of Wyandotte county he did not take the examination; that in the past he has maintained offices in Kansas City, Mo., and has practiced law both in Missouri and in Kansas, but in this state always in connection with some attorney, and the names of several are mentioned. He professes a willingness to take an examination for admission to the bar in this state, and asks permission of the court to do so.

This court set the matter for hearing as to what order should be made upon the pleadings filed. At the hearing, participated in by the defendant in person, the oral arguments and briefs went much more into detail as to the extent and nature of defendant's activities in the practice of law. Defendant in his brief advises us that he

spent his boyhood in Indiana, where he attended the common schools and finished two years of high school in 1884; that thereafter he worked in different places and at various occupations until 1892, when he went to St. Louis and started a three-year course in a school of law, working in the meantime for various packing companies, and in December, 1900, took the examination before the bar examining board and was admitted to practice in all the courts of Missouri, and practiced law in St. Louis for six years, and one year at Mokano, Mo.; that he moved to Kansas City, Kan., in 1907, and began work for a packing company, became interested in some man who was in jail, went before one of the district judges and was introduced by an attorney and was told to take the oath and sign as an attorney, which he did; that for many years he worked for various packing companies and railroads, but all the time did some work as a lawyer; that the cases which he had in Missouri he tried himself, and those he had in Kansas he had some Kansas attorney with him; that for the seven years last past he has endeavored to make a living practicing law, being for three years with one attorney and three years with another, and for the last year by himself; that while with one of these attorneys he wrote 270 petitions and all other papers necessary; that most of his clients are people of small means, and he states the amount of fees they have paid him in the last few months; that he does not solicit law business, but when clients come to him he advises them, and if court action is deemed proper he prepares the papers, has the client sign them, and gets some other attorney to assist in the trial of the case.

From the brief of the plaintiff we are advised, and defendant has not contradicted this, although he has had an opportunity to do so, that within the last few years there have been filed, mostly in the district court but some in the city court, approximately one hundred civil actions in which defendant's name appeared as attorney for one of the parties, usually the plaintiff. In about half of these cases some other attorney appeared with defendant as attorney for the party, but in about half of them he was the sole attorney. In sixteen of these he was also the plaintiff. Most of these were actions for damages; several of them for libel or slander. One was a quo warranto action to oust a justice of the peace from office, another was to regulate the fares of a street-car company, and another against the mayor and city commissioners charging them with being inefficient in analyzing the ills of the city government and asking

that a receiver be appointed to take over the management of the city, alleging that he was a *bona fide* resident and taxpayer therein. Three of these sixteen actions were tried, resulting in judgments for defendants, one was removed to the federal court, and two are pending. The others were dismissed for want of prosecution, or for want of jurisdiction of the court, or a demurrer was sustained, either to the petition or to the evidence. Collectively, and almost entirely, these actions were predicated upon ill-founded claims and unjust accusations. In a few of them plaintiff recovered small amounts. About ninety per cent of them were filed on poverty affidavits in lieu of bond or deposit for costs, although several of them in which such affidavits were filed disclosed either that the plaintiff possessed substantial property or that the action was predicated upon such possession, and in only a few of them have any costs been paid. It further appears that defendant is now conducting what he calls the "Western Credit and Adjustment Service" at an office in the business part of the city, on the letterhead of which his name appears as "Counselor and Manager." On February 18, 1925, defendant filed in this court a petition for admission to the bar, accompanied by a fee of $25, then required. On March 2, 1925, he withdrew the application and asked for the return of the fee, which request was granted. He has made no further request for admission to the bar other than that contained in his answer filed in this action.

Passing now to the questions to be determined. We first note defendant's contention that since he was admitted to practice law in Missouri in 1900, and practiced law there for seven years, he should be permitted to practice law in this state on the rule of comity between states. The license or permission to practice law in one state is not extraterritorial. Defendant has been a resident of this state for more than twenty-five years. There is no rule of comity between states which requires this state to give him authority to practice law here because previously he had been admitted to the practice of law in another state. With reference to the admission of attorneys to practice law in this state who previously have been admitted to practice law in the courts of another state we have a rule which reads (R. S. 7-123, rule ix):

"All applicants who are otherwise qualified, and who have been admitted to practice in the highest court in another jurisdiction and have practiced there continuously for a period of five years or more, and continued to practice there

or elsewhere up to the time of making application here, shall constitute a class and be examined separately, in such manner as the board may determine."

Defendant's application, made in February, 1925, was for admission under this rule, but it was withdrawn, and no other has been made. All we can say in reply to his present request that he be admitted is that he may at any time make application to the board of law examiners, and no doubt his application will be considered. It will be observed this rule does not require the admission of one simply because he had been admitted in another state. He must first show that he is "otherwise qualified," and then he may enter a class to be examined separately from those who have not been admitted in other states, in such manner as the board of law examiners may determine. When an attorney, resident of another state and admitted to practice law there, has an action pending in one of the courts of this state, the court of this state in which such case is pending ordinarily will recognize him as an attorney for the trial of that case. Apparently that is what was done by the district court for defendant in 1907. Such permission, of course, is not a general admission to practice law in this state. Under our statute (R. S. 7-102), since 1903, the district courts of this state have not had authority to admit an applicant to the general practice of law in this state. It follows, therefore, that defendant has never been admitted as an attorney in this state with authority generally to practice law in this state.

Defendant questions the jurisdiction of this court to hear and determine this action. Our constitution (art. 3, § 3) gives this court original jurisdiction in proceedings in quo warranto, and our statute (R. S. 60-1602) authorizes such actions when any person shall usurp, intrude into, or unlawfully hold or exercise any public office or shall claim any franchise within this state. While an attorney at law is not a public officer in the sense that term is ordinarily used, he is nevertheless "an officer of the court" (*In re Pryor,* 18 Kan. 72; *Hanson v. Grattan,* 84 Kan. 843, 115 Pac. 646; 6 C. J. 568; 2 R. C. L. 939; *Ex parte Garland,* 71 U. S. [4 Wall.] 333), and as such is a part of the judicial system of the state, and he obtains that position under and by virtue of the constitution and laws of the state relating to that office and to the judicial branch of our government. Also, his authority, or permit, or license to act as an attorney at law is a privilege "in the nature of a franchise from the state conferred only for merit" (*Matter of Coöperative Law*

*Co.,* 198 N. Y. 479, 92 N. E. 15; *People v. California Protective Corp.,* 76 Cal. App. 354, 244 Pac. 1089), and revocable on his violation of his obligations and duties. This court, therefore, has specific constitutional and statutory authority and jurisdiction to inquire of defendant by what right he intrudes into the position and exercises the affairs of an attorney at law and attempts to use the franchise of one admitted to practice law in this state.

Then our statute (R. S. 7-102, 7-111) grants to this court authority to admit attorneys to the practice of law and to suspend or disbar them therefrom. This of necessity gives the court authority to make and enforce rules respecting the admission or exclusion of persons to the practice of law. This authority would be ineffectual if those not admitted as attorneys at law, or authorized to practice law, could nevertheless engage in that practice. On this point we approve the language of the supreme court of Illinois in *The People v. Peoples Stock Yards Bank,* 344 Ill. 462, 176 N. E. 901, where it was said:

"Having inherent and plenary power and original jurisdiction to decide who shall be admitted to practice as attorneys in the state, this court also has all the power and jurisdiction necessary to protect and enforce its rules and decisions in that respect. Having power to determine who shall and who shall not practice law in this state, and to license those who may act as attorneys and forbid others who do not measure up to the standards or come within the provisions of its rules, it necessarily follows that this court has the power to enforce its rules and decisions against offenders, even though they have never been licensed by this court. Of what avail is the power to license in the absence of power to prevent one not licensed from practicing as an attorney? In the absence of power to control or punish unauthorized persons who presume to practice as attorneys and officers of this court, the power to control admissions to the bar would be nugatory. And so it has been held that the court, which alone has authority to license attorneys, has as a necessary corollary ample implied power to protect this function by punishing unauthorized persons for usurping the privilege of acting as attorneys. (*In re Morse,* 98 Vt. 85, 126 Atl. 550, 36 A. L. R. 527.)" (p. 471.)

In harmony with the statutory provision above referred to, but more fundamental, is the inherent power of courts to admit qualified persons to the practice of law and to refuse disqualified persons authority to engage in such practice, even to the extent of disbarring those who have once been admitted. In *Ex Parte Secombe,* 60 U. S. (19 How.) 9, it was held:

"By the rules and practice of common-law courts, it rests exclusively with the court to determine who is qualified to become or continue one of its officers, as an attorney and counselor of the court; the power being regulated,

however, by a sound and just judicial discretion—guarding the rights and independence of the bar as well as the dignity and authority of the court."

In the recent case of *In re Richards,* 63 S. W. 2d 672 (Mo.), the supreme court of Missouri *in banc* extensively reviewed the authorities on this point and held the supreme court has inherent original jurisdiction in proceedings to disbar attorneys. This power may be regulated by statute, but cannot be frustrated or destroyed. Among the authorities there cited are *Farlin v. Sook,* 30 Kan. 401, 1 Pac. 123, and *In re Norris,* 60 Kan. 649, 57 Pac. 528. To these might have been added: *In re Pryor,* supra; *In re Burnette,* 73 Kan. 609, 85 Pac. 575; *In re Smith,* 73 Kan. 743, 85 Pac. 584; *In re Wilson,* 79 Kan. 450, 100 Pac. 75; *In re Washington,* 82 Kan. 829, 109 Pac. 700; *Hanson v. Grattan,* 84 Kan. 843, 115 Pac. 646; *In re Hanson,* 99 Kan. 23, 160 Pac. 1141; *In re Macy,* 109 Kan. 1, 196 Pac. 1095, 14 A. L. R. 848; *In re Staton,* 112 Kan. 226, 210 Pac. 615; *In re Gorsuch,* 113 Kan. 380, 214 Pac. 794; *Moore v. Wesley,* 125 Kan. 22, 262 Pac. 1035; *In re Casebier,* 129 Kan. 853, 288 Pac. 599.

A proceeding in the nature of quo warranto in this court by the state on the relation of the attorney-general is appropriate to inquire into the authority of one who engages in the practice of law in this state. The ancient writ was a demand made by the state on some individual to show by what right he exercised some franchise or privilege appertaining to the state which, according to the laws of the land, he could not legally exercise except by virtue of some grant of authority. (22 R. C. L. 656; 51 C. J. 309; *State v. Graham,* 13 Kan. 136, 144.) In *Redmond v. State, ex rel.,* 152 Miss. 54, 118 So. 360, 367, it was held to be a proper remedy where a person was practicing medicine without having obtained a license in the manner required by law. See, also, *Harris v. State,* 215 Ala. 56, 109 So. 291, construing a statute. But the jurisdiction of this court in quo warranto is derived from the constitution rather than from the statute. (*State v. Brewing Association,* 76 Kan. 184, 195, 90 Pac. 777.) The remedy is one frequently used to inquire by what authority one who attempts to do so engages in the practice of law. (*Berk v. State,* 225 Ala. 324, 142 So. 832.) See cases collected in the annotation, 73 A. L. R. 1327. Some of the courts have made such inquiries and issued their orders under an accusation for contempt. (*People v. Castleman,* 88 Col. 207, 294 Pac. 535; *People v. Association of Real Estate Taxpayers,* 187 N. E. 823 [Ill.] ; *In re Morse,* 98 Vt.

85, 126 Atl. 550, and cases collected in annotation 36 A. L. R. 533.) Others have held injunction a proper remedy (*Unger v. Landlords Management Corporation*, 168 Atl. 229 [N. J.]), but that would not be appropriate here, as this court issues injunctive orders only as they are ancillary to some action or proceeding in which it has jurisdiction under the constitution, namely, quo warranto, mandamus, or habeas corpus, or in appealed cases. Inquiries of this character have been made on the complaint of duly licensed members of the bar, or of bar associations (*People, ex rel. Karlin, v. Culkin*, 248 N. Y. 465, 162 N. E. 487; and see cases collected in the annotations 60 A. L. R. 860). The form in which the matter is called to the court's attention is not so important. Since the court has jurisdiction of the subject matter, any recognized procedure by which a charge or complaint is entertained, and the one charged is given proper notice, and in which there is a full hearing fairly conducted, would appear to be sufficient.

The importance to courts and litigants of well-informed, trustworthy attorneys at law is well recognized, and frequently has been judicially noticed. Recently, in *In re Opinion of the Justices*, 279 Mass. 607, 180 N. E. 725, it was said:

"It is indispensable to the administration of justice and the interpretation of the laws that there be members of the bar of sufficient ability, adequate learning and sound moral character. This arises from the need of enlightened assistance to the honest, and restraining authority over the knavish litigant. It is highly important, also, that the public be protected from incompetent and vicious practitioners, whose opportunity for doing mischief is wide." (p. 609.)

In *In re Cannon*, 206 Wis. 374, 240 N. W. 441, it was said:

"The relation of the bar to the courts is a peculiar and intimate relationship. The bar is an attaché of the courts. The quality of justice dispensed by the courts depends in no small degree upon the integrity of its bar. An unfaithful bar may easily bring scandal and reproach to the administration of justice and bring the courts themselves into disrepute." (p. 383.)

The opinion contains an exhaustive history of the development of the bar as an aid in the administration of justice.

In *Rosenthal v. State Bar Examining Committee*, 116 Conn. 409, 165 Atl. 211, it was said:

"The practice of law is not a craft or a trade; it is a profession the main purpose of which is to aid in the doing of justice according to law between the state and individual and between man and man. The occasions upon which an attorney may be required to act touch, in many instances, the deepest and

most precious concerns of men, women, and children. They may involve the liberty, the property, the happiness, the character and the life of his client. Obviously, one not possessing an adequate degree of intelligence and education cannot perform this kind of service, nor should he be permitted to attempt to do so. . . .

"The ultimate purpose of all regulations of the admission of attorneys is to assure the courts the assistance of advocates of ability, learning, and sound character and to protect the public from incompetent and dishonest practitioners." (pp. 414, 415.)

This court can perform no greater general service to the litigants and other citizens of the state than to see to it that attorneys who practice law in this state are trustworthy and have the requisite general and legal learning to enable them to be of real service to the courts and to their clients. To accomplish that result our rules require an applicant for admission to the bar to have completed a standard four-years high-school course and two years (after June 1, 1936, three years) of a general college course and to have been graduated from the law school of the state university, or to show an equivalent study, and in addition to show that he is possessed of high moral character. A board of law examiners is provided to make the necessary investigations and examinations. Provision also is made for hearing complaints against members of the bar, and the court does not hesitate to suspend and expel an attorney found unworthy to practice law. This is in keeping with the recommendations of the American Bar Association and similar requirements in other states. With greater reason the courts should see to it that unauthorized persons do not practice law in this state. (*Bryce v. Gillespie,* 168 S. E. 653 [Va.]; *In re Disbarment of George H. Otterness,* 181 Minn. 254, 232 N. W. 318; *The People v. Peoples Stock Yards Bank,* 344 Ill. 462; *Berk v. State,* 225 Ala. 324; *In re Eastern Idaho Loan & Trust Co.,* 49 Ida. 280, 288 Pac. 157; *Unger v. Landlords Management Corporation,* 168 Atl. 229; *People v. Association of Real Estate Taxpayers,* 187 N. E. 823.)

This brings us to the question of what is practicing law. The general meaning of the term is of common knowledge, although the boundaries of its definition may be indefinite as to some transactions. We shall not bother with boundary-line distinctions here, for this is not a boundary-line case. A general definition of the term frequently quoted with approval is given in *Eley v. Miller,* 7 Ind. App. 529, 34 N. E. 836, as follows:

"As the term is generally understood, the practice of the law is the doing

or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity to the adopted rules of procedure. But in a larger sense it includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured, although such matter may or may not be depending in a court." (p. 535.)

In *The People v. Peoples Stock Yards Bank*, 344 Ill. 462, it was said:

"In litigated matters it involves not only the actual representation of the client in court, but also services rendered in advising a client as to his cause of action or defense. The practice of law also includes the giving of advice or rendering services requiring the use of legal skill or knowledge. . . . Where a will, contract or other instrument is to be shaped from facts and conditions, the legal effect of which must be carefully determined by a mind trained in the existing laws in order to insure a specific result and guard against others, more than the knowledge of the layman is required, and a charge for such service brings it definitely within the term 'practice of the law.'" (pp. 475, 478.)

Other definitions may be found in *Savings Bank v. Ward*, 100 U. S. 195; *In re Duncan*, 83 S. C. 186, 65 S. E. 210; *State Bar of California v. Superior Court*, 207 Cal. 323, 278 Pac. 432; *In re Eastern Idaho Loan & Trust Co.*, supra; *Unger v. Landlords Management Corporation*, supra. One who confers with clients, advises them as to their legal rights, and then takes the business to an attorney and arranges with him to look after it in court is engaged in the practice of law. See *Berk v. State*, supra, and authorities cited therein. And an attorney at law who conducts such an association with one unauthorized to practice law is guilty of knowingly and intentionally aiding and abetting an unlicensed person to practice law (*Smallberg v. The State Bar*, 212 Cal. 113, 297 Pac. 916), and subject to discipline. (*In re Gorsuch*, supra.) An unauthorized person has no more authority to practice law in a justice court than he has in a court of record. (*In re Morse*, supra; *Bryce v. Gillespie*, supra.) The use of the terms "lawyer," "attorney at law," "counselor," on letterheads or elsewhere by one unauthorized to practice law is not justified.

Without restating the facts disclosed by the record it is clear defendant has engaged in the unauthorized practice of law in about all the ways it is possible for one to do.

Judgment is entered for plaintiff, and defendant is hereby ordered and directed to cease the practice of law in any and all of the courts

of this state; to cease his practice of conferring with clients, outlining their litigation, and taking it to some other attorney to file and to appear in court; to cease the preparation of legal instruments from facts and circumstances which require a knowledge of the law where certain objects are to be accomplished and others avoided. where a fee is charged or received therefor; and to cease using the words "counselor," "lawyer," "attorney at law," or similar terms. on his stationery, or otherwise holding himself out to be engaged in the practice of law.

HUTCHISON, J., not sitting.